IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEVLIN KYRE,              )
                               )
           Plaintiff,      )
                               )
         v.              )      1:24CV273
                               )
EXPERIAN INFORMATION      )
SOLUTIONS, INC.,         )
                               )
           Defendant.      )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

While Mark Twain is famously said to have joked that the reports of his death were greatly exaggerated,[1] it was no laughing matter for Plaintiff Devlin Kyre when his credit report prematurely declared his demise. In this action, Kyre seeks recovery from Defendant Experian Information Solutions, Inc. ("Experian") for damages related to its erroneous reporting. Experian now seeks to compel Kyre to arbitrate his claims. (Doc. 13.) Kyre has filed a response in opposition (Doc. 16), and Experian has filed a reply. (Doc. 18.) The parties have also filed extensive supplemental authority, which the court has considered (Docs. 19-20; 23-24; 26-28; 33; 35-36; 38), and the court heard argument on the motion. (Doc. 40.) Thereafter, the parties filed supplemental briefing at

---

[1] See SHELLEY FISHER FISHKIN, LIGHTING OUT FOR THE TERRITORY: REFLECTIONS ON MARK TWAIN AND AMERICAN CULTURE 134 (1996).

the court's request.  (Docs. 41–42; 47–48; 50.)  For the reasons that follow, the court will grant Experian's motion to compel arbitration in part pursuant to the parties' 2017 Terms of Use Agreement.

## I.  BACKGROUND

In January 2024, Kyre applied with Capital One Bank, N.A. ("Capital One") for pre-approval for credit.  (Doc. 1 ¶¶ 71–72.) He filled out his application online by providing his social security number and additional identifying information.  (Id. ¶ 72.)  On January 7, 2024, Capital One ordered Kyre's consumer report from Experian.  (Id. ¶ 73.)  Unbeknownst to Kyre, the report erroneously indicated that Kyre was deceased and did not include a credit score.  (Id. ¶ 76.)  Relying on Experian's report, Capital One denied Kyre's credit application.  (Id. ¶ 77.)

Thereafter, Kyre paid Experian $18 for a copy of his consumer file.  (Id. ¶ 80.)  The copy Experian provided him also indicated that he was deceased.  (Id. ¶ 81.)  Because of this, Experian did not generate Kyre's credit score.  (Id. ¶ 82.)  Through further research, Kyre discovered that Experian had been reporting that he was deceased since at least October 2019.  (Id. ¶ 87.)  In contrast, TransUnion and Equifax, two other credit reporting services, were not reporting that he had died.  (Id. ¶¶ 88–92.)  Kyre discussed the error with Capital One and disputed the reporting through Experian's online interface.  (Id. ¶¶ 95–96.)  At some point,

2

"Experian conceded its inaccuracy and removed the deceased notation." (Id. ¶ 97.)

Kyre filed suit against Experian, alleging that it violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. (Doc. 1. ¶¶ 103–110.) Experian filed an answer that asserted ten affirmative defenses, including that "[Kyre]'s claims may be the subject of an arbitration agreement between [Kyre] and Experian." (Doc. 8 at 17–19.) Soon after, Experian filed the present motion to compel arbitration. (Doc. 13.)

Experian argues that Kyre enrolled in CreditWorks, a "credit monitoring service" that Experian provides through affiliate entities, on October 13, 2017. (Doc. 14 at 3, 5.) In support, Experian submitted the sworn declaration of Dan Smith, Director of Product Operations for ConsumerInfo.com, Inc., which does business as Experian Consumer Services. (Doc. 15 ¶ 1.) Smith, who has worked for ConsumerInfo.com, Inc. since January 2010, reports that he is familiar with the process whereby consumers enroll in CreditWorks, the forms they must complete to enroll in the service, and the webpages they would have encountered at their time of enrollment. (Id.) Smith further states that he is able to review Experian's internal records to determine when users log-in to their account or change their information in the CreditWorks system, and he says that he has access to each CreditWorks user's individual "date and time of enrollment, the version of the Terms of Use they

3

agreed to, and the exact path the consumer encountered when completing their enrollment into CreditWorks." (Id.)

Smith's declaration identified the relevant webforms Kyre had to complete to enroll in CreditWorks on October 13, 2017. (Id. ¶¶ 3-5.) Relevant here, one webform required Kyre to provide his social security number, date of birth, and a username and password. (Id. ¶ 3.) Underneath the boxes where Kyre was asked to input his information was the following text:

> By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy. I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to provide them to me for review while I have an account with ECS. I also authorize ECS to obtain and use the information I provide, and my credit report and/or credit score(s), on a recurring basis to notify me of credit opportunities and other products and services that may be available to me through ECS or through unaffiliated third parties. I understand that I may withdraw this authorization at any time by contacting ECS.

(Doc. 15-2.)

A clickable icon that read "Submit Secure Order" was directly beneath this text. (Doc. 14 at 6.) Attached to Smith's declaration is the following screenshot of the webform Kyre would have viewed at this point:

4



**experian.**

Have questions? Contact us.

Already a member? Sign in.

### Create Your Account

| ✔ Step 1 | Step 2 | Step 3 | Step 4 |

**Identity Verification**

**Social Security Number**

| — — | Why do we need this? |

☐ Display

**Date of Birth**

| Month | Day | Year |

**Account Information**

**Username**

**Password**          **Confirm Password**

By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy. I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to provide them to me for review while I have an account with ECS. I also authorize ECS to obtain and use the information I provide, and my credit report and/or credit score(s), on a recurring basis to notify me of credit opportunities and other products and services that may be available to me through ECS or through unaffiliated third parties. I understand that I may withdraw this authorization at any time by contacting ECS.

**Submit Secure Order**

### Your Order Summary

| Experian CreditWorks℠ Basic | $0.00 |
| ✔ Free Experian Credit Report | |
| ✔ Report Refreshed Every 30 Days on Sign In | |
| ✔ Experian Credit Monitoring Alerts * | |
| ✔ Free Dark Web Surveillance Report | |
| ✔ Toll-Free Support Available 7 Days a Week | |
| Sales Tax | $0.00 |
| **Order Total** | **$0.00** |

* Includes New Inquiries, New Accounts, Public Records, Fraud Alerts and Personal Information updates when added to your Experian Credit Report

**Privacy Policy Notice**

ConsumerInfo.com, Inc.'s policy on how your personal information is used and disclosed is contained in our Privacy Policy and Ad Targeting Policy. This product is Web-based and you agree to accept this notification, revisions, and the provision of an annual notice electronically through this website, if required.

Terms & Conditions    Privacy Policy    Contact Us    Ad Targeting Policy

© 2017 ConsumerInfo.com, Inc.

(Doc. 15-2.)

Case 1:24-cv-00273-TDS-LPA    Document 51    Filed 05/30/25    Page 5 of 27

According to Smith, clicking the blue "Terms of Use Agreement" phrase would have redirected the user – Kyre - via a hyperlink to a webpage that contained the terms of a proposed agreement. (Doc. 15 ¶ 4.) The proposed agreement contained the following dispute resolution provision:

> DISPUTE RESOLUTION BY BINDING ARBITRATION
>
> PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.
>
> *    *    *
>
> Arbitration Agreement:
>
> (a) **ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites, except any disputes or claims which under governing law are not subject to arbitration.** This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. **However, for the avoidance of doubt, any dispute you may have with us arising out of the Fair Credit Reporting Act (FCRA) relating to the information contained in your consumer disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be governed by this agreement to arbitrate . . . .**

(Doc. 15-3 at 7 (emphasis added).) It also contained the following delegation clause assigning to the arbitrator the determination of the scope of the arbitration provision[2]:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration

---

[2] A delegation clause is a contractual provision that "tasks the arbitrator," rather than the court, "with determining whether a particular controversy is covered by the parties' agreement to arbitrate. <u>Mod. Perfection, LLC v. Bank of Am., N.A.</u>, 126 F.4th 235, 242 (4th Cir. 2025) (citing <u>Hengle v. Treppa</u>, 19 F.4th 324, 335 (4th Cir. 2021)).

6

provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. The arbitrator shall be bound by the terms of this Agreement.

(Id. at 8.)  And the arbitration provision granted Kyre the right to reject any subsequent change Experian may make to the arbitration provision:

> (g) **Notwithstanding any provision in this Agreement to the contrary, we agree that if ECS makes any change to this arbitration provision** (other than a change to the Notice Address) during your membership in any Service, including credit monitoring, or subsequent to your purchase of any Service, **you may reject any such change and require ECS to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises regarding such Service.**

(Id. at 9 (emphasis added).)  Smith states that Kyre accepted this 2017 Terms of Use Agreement and therefore agreed to arbitrate this dispute by clicking the "Submit Secure Order" icon.  (Doc. 15 ¶ 5.) According to Smith, Kyre would not have been able to successfully enroll in CreditWorks, as he did, unless he clicked that icon. (Id.)

Experian contends, however, that it updated the 2017 Terms of Use Agreement between Kyre's 2017 enrollment in CreditWorks and the filing of this action in 2024.  (Doc. 18 at 11.)  According to Smith, a provision of the 2017 Terms of Use Agreement provided

notice that Kyre would be deemed to have accepted any updates to the agreement through his continued use of CreditWorks:

AMENDMENTS

This Agreement may be updated from time to time. You should check this Website regularly for updates to this Agreement. **Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.** Modifications take effect as soon as they are posted to this Website (or any of the Websites, to the extent applicable to you), delivered to you, or reasonably made available to you in writing by ECS. However, no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing. In all other respects, any modification or update to the arbitration provision shall be governed by subsection (g) of the Agreement's "Dispute Resolution By Binding Arbitration" Section below.

(Docs. 15 ¶ 7; 15-3 at 4 (emphasis added).)

Experian contends that a December 11, 2023 update to the Terms of Use Agreement that eliminated the arbitration carve-out for FCRA claims governs the case. (Doc. 18 at 11–12.) According to Smith's declaration, the updated provision provides:

**DISPUTE RESOLUTION BY BINDING ARBITRATION**
PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.

*   *   *

**ECS and you agree to arbitrate all disputes and claims between us that arise out of or relate to this Agreement, which includes any Information you obtain through the Services or Websites, to the maximum extent permitted by law,** except any disputes or claims which under governing law are not subject to arbitration. For purposes of this Arbitration Agreement, the term "Information" means any credit, personal, financial or other information delivered to you as part of, or in conjunction with, the

8

Services, including any such information that may be archived to the extent made available on the Websites, including (i) for your purchase of non-membership based Services such as the 3 Bureau Credit Report and FICO® Scores, the FICO Industry or other Base FICO Scores and/or an Experian Credit Report and FICO Score, (ii) enrollment and use of free Services (such as EXPERIAN CREDITWORKS Basic), and/or enrollment, purchase and use of membership based Services (such as EXPERIAN CREDITWORKS Premium, Experian IdentityWorks, or Experian Credit Tracker); and (iii) your access to and use of calculators, credit resources, text, pictures, graphics, logos, button items, icons, images, works of authorship and other information and all revisions, modifications, and enhancements thereto contained in the Websites.

**This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us relating to, or arising out of, this Agreement, any Service and/or Website, including any Information you obtained through the Services or Websites, subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to, claims brought by you against ECS,** whether based in contract, tort, statute (including, **without limitation, the Fair Credit Reporting Act** and the Credit Repair Organizations Act), for fraud, misrepresentation or any other legal theory; claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising) . . . .

(Doc. 15-4 at 8-9 (emphasis added except for the heading).) Smith states that "After enrolling, Plaintiff continuously remained enrolled and used the service, including after the version of the Terms of Use in effect at the time he filed this lawsuit came into effect." (Doc. 15 ¶ 5.) Kyre denies that he entered into any valid agreement to arbitrate, but he argues that if there is such an agreement, it is the 2017 version. (Doc. 16 at 2.)

At the hearing on Experian's motion, the court requested that the parties submit supplemental briefing as to how, if at all, Marshall v. Georgetown Memorial Hospital, 112 F.4th 211 (4th Cir. 2024), and Modern Perfection, LLC v. Bank of America, N.A., 126 F.4th 235 (4th Cir. 2025), decided after the parties submitted their initial filings, affected their positions and Experian's argument that the arbitration provision of the 2023 Terms of Use Agreement governs but, alternatively, the arbitrator should decide which version controls. (Doc. 40 at 17, 46; Minute Entry 01/24/2025.) The parties filed their respective briefs. (Docs. 41; 42.) After receiving those briefs, the court advised the parties that they had not addressed whether Experian had demonstrated the presence or absence of a dispute of material fact under North Carolina law as to whether Kyre agreed to the 2023 modification of that agreement. (Doc. 44.) The parties filed further briefing. (Docs. 47; 48.) In its brief, Experian explained that it intended to file a supplemental declaration establishing that Devlin Kyre "completed the full CreditWorks enrollment process for a second time on January 8, 2024." (Doc. 47 at 3.) Noting the potential impact of such evidence, the court therefore advised the parties it would hold Experian's motion in abeyance pending receipt of such evidence. (Doc. 49.) Two days later, Experian filed a notice that it would rest on the existing record. (Doc. 50.) Consequently, Experian's motion to compel

10

arbitration is ripe for decision.

## II. ANALYSIS

The parties present two principal issues. First, they disagree whether Experian has demonstrated that Kyre agreed to arbitrate his claims at all. Second, assuming the parties agreed to arbitrate any dispute, they disagree whether the arbitration provision of the 2017 Terms of Use Agreement governs the dispute or whether Kyre agreed to the updated arbitration provision in the 2023 Terms of Use Agreement by continuing to use CreditWorks. Alternatively, Experian contends that regardless which arbitration agreement applies, both arbitration provisions delegate the question of whether Kyre's claim is subject to arbitration to an arbitrator, such that this court should simply refer the case to arbitration and stay the action.

### A. Whether the Parties Agreed to Arbitrate

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., establishes "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "When parties have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial proceedings and compel arbitration in accordance with the agreement's terms." Murray v. United Food & Com. Workers Int'l Union, 289 F.3d 297, 301 (4th

11

Cir. 2002) (citations omitted); 9 U.S.C. §§ 3-4. However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Am. Bankers Ins. Grp. v. Long, 453 F.3d 623, 626-27 (4th Cir. 2006) (citation and internal quotation marks omitted). As such, the court must determine whether parties have a valid and enforceable agreement to arbitrate. Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 234 (4th Cir. 2019) (citations omitted).

The burden to establish that a binding arbitration agreement exists rests with the party seeking to compel arbitration. Marshall, 112 F.4th at 217 (citing Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., 867 F.3d 449, 456 (4th Cir. 2017)). The movant must demonstrate: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute." Am. Gen. Life & Accident Ins. v. Wood, 429 F.3d 83, 87 (4th Cir. 2005) (quoting Adkins v. Labor Ready, Inc., 303 F.3d 496, 500-01 (4th Cir. 2002)). Generally, any ambiguity regarding the scope of the arbitrable issues should be resolved in favor of arbitration. Moses H. Cone, 460 U.S. at 24-25; Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006) (citation

12

omitted). However, the FAA's presumption in favor of arbitration does not extend to the court's consideration of whether the parties agreed to arbitrate the arbitrability of particular issues. <u>Carson v. Giant Food, Inc.</u>, 175 F.3d 325, 329 (4th Cir. 1999) (citation omitted).

To determine whether an arbitration agreement exists, a court essentially applies the summary judgment standard to assesses whether there is a genuine dispute of material fact regarding formation of the arbitration agreement. <u>Marshall</u>, 112 F.4th at 217 (citing <u>Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC</u>, 993 F.3d 253, 258 (4th Cir. 2021)); <u>Berkeley</u>, 944 F.3d at 234. Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate with specific evidence that there is a genuine dispute of material fact requiring trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986); <u>see</u> <u>Drews Distrib., Inc. v. Silicon Gaming, Inc.</u>, 245 F.3d 347, 352 n.3 (4th Cir. 2001) (stating that a trial on the existence of an arbitration agreement is inappropriate where the party opposing arbitration fails to unequivocally deny that an arbitration agreement has been made). In making its determination, the court is entitled to consider materials beyond the complaint and its supporting documents. <u>Berkeley</u>, 944 F.3d at 234 (citation omitted). If unresolved questions of material fact prevent the court from deciding the arbitrability issue, the court shall hold

13

"an expeditious and summary hearing." <u>Moses H. Cone</u>, 460 U.S. at 22; 9 U.S.C. §§ 3-4.

"Whether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles." <u>Marshall</u>, 112 F.4th at 217 (quoting <u>Rowland</u>, 993 F.3d at 258). The parties agree that North Carolina law governs the contract formation dispute. (Docs. 14 at 9-10; 16 at 7.) "Under North Carolina law, a valid contract 'requires offer, acceptance, consideration, and no defenses to formation.'" <u>Hightower v. GMRI, Inc.</u>, 272 F.3d 239, 242 (4th Cir. 2001) (quoting <u>Koltis v. N.C. Dep't of Hum. Res.</u>, 480 S.E.2d 702, 704 (N.C. Ct. App. 1997)).

In support of its motion, Experian submitted Smith's sworn declaration, various screenshots of the CreditWorks webpage that Kyre would have interacted with when he requested his Experian credit report, and copies of the CreditWorks's Terms of Use Agreement in 2017 and 2023. (Docs. 15; 15-1; 15-2; 15-3; 15-4.) Smith testifies that based on his review of CreditWorks's corporate records and those of Experian related to consumer enrollment, and based on his knowledge of the "CreditWorks enrollment process and Experian's databases that store consumer account information," Kyre enrolled in 2017.[3] (Doc. 15 ¶¶ 1, 3-7.) Smith states that

---

[3] Smith's employer, ConsumerInfo.com, Inc. does business as Experian Consumer Services. (Doc. 15 ¶ 1.) Although the 2017 Terms of Use Agreement is between Kyre and Experian Consumer Services, the court finds

14

Kyre could not have signed up for Experian credit reporting without agreeing to the Terms of Use Agreement at that time. (Id. ¶¶ 1, 3.) Smith's declaration also includes screenshots of the then-current Experian enrollment webpage that are consistent with his statements. (Docs. 15-1; 15-2.)

Kyre does not dispute that he has had an Experian account since 2017. (Doc. 17 ¶ 2.) Instead, he claims he did not knowingly agree to arbitrate disputes and enroll in CreditWorks by signing up for an Experian account. (Id. ¶¶ 3-7.) Further, he argues that Smith's declaration is inadmissible as evidence of an agreement to arbitrate because Smith lacks the personal knowledge of Kyre's CreditWorks enrollment process. (Doc. 16 at 7-17.) At a minimum, Kyre argues, he should be permitted discovery into what Smith actually knows. (Id. at 17.)

The court finds, as courts across the country have acknowledged, that Smith's declaration is admissible. See, e.g., Williams v. Experian Info. Sols. Inc., No. CV-23-01076, 2024 WL 3876171, at *6-10 (D. Ariz. Aug. 20, 2024); George v. Experian Info. Sols., No. 23-cv-02303, 2024 WL 3013146, at *7 (D. Md. June 14, 2024); Hunt v. Experian Info. Sols. Inc., No. 5:24-cv-00348, 2025 WL 104324, at *3 (M.D. Ga. Jan. 15, 2025) (collecting cases);

---

Experian can enforce the agreement, as other courts have routinely concluded. See, e.g., Williams v. Consumerinfo.com, Inc., No. 1:24-cv-02017, 2024 WL 5186620, at *8 (D.D.C. Dec. 20, 2024); Oatway v. Experian Info. Sols., Inc., No. 2:24-cv-00523, 2024 WL 4879822, at *3 (W.D. Wash. Nov. 25, 2024).

(Doc. 18 at 2.) Smith has testified that the scope of his employment requires that he be familiar with the CreditWorks enrollment process and Experian's databases that store account information relating to a consumer's membership. (Doc. 15 ¶ 1.) He is also familiar with Experian's internal records "that document consumers' ongoing use of their CreditWorks account, including when a consumer logs into their account or changes their account information." (Id.) Based on that information, Smith states he can "confirm the consumer's membership details, such as the date and time of enrollment, the version of the Terms of Use they agreed to, and the exact path the consumer encountered when completing their enrollment into CreditWorks." (Id.) This is sufficient authentication to support a corporate officer's personal knowledge of the acts of his corporation. Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1342 (4th Cir. 1992); Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 135 n.9 (4th Cir. 2002); In re Apex Exp. Corp., 190 F.3d 624, 635 (4th Cir. 1999). Accordingly, Smith's declaration is admissible and establishes that Kyre could not have enrolled in CreditWorks without agreeing to the 2017 Terms of Use Agreement.

Kyre's contention that he does not recall enrolling in CreditWorks and was unaware of the particular terms of any agreement is unavailing. Kyre has not expressly denied, either in his filings or at the hearing in this case, that he entered into

16

a Terms of Use Agreement with Experian. (Doc. 40 at 21.) Nor has he produced any evidence that would generate a genuine dispute of material fact whether he assented to the arbitration agreement. As another judge in this district has put it:

> Where a proponent of an arbitration agreement offers credible, admissible evidence to support a finding of an agreement to arbitrate, the opponent cannot rely on mere unawareness of whether it had made an arbitration agreement . . . . In disputed cases, the party opposing arbitration must unequivocally deny that there was an arbitration agreement and produce evidence to substantiate the denial.

Dillon v. BMO Harris Bank, N.A., 173 F. Supp. 3d 258, 264 (M.D.N.C. 2016) (citations omitted).

Smith's declaration establishes that Kyre could not have enrolled in CreditWorks without clicking the "Submit Secure Order" icon that manifested his acceptance of the 2017 Terms of Use Agreement. (Doc. 15 ¶ 3.) His declaration also establishes that the agreement, attached as an exhibit, prominently set out an arbitration agreement that was captioned: "DISPUTE RESOLUTION BY BINDING ARBITRATION" and cautioned the reader to "PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS." (Doc. 15-3 at 7.) That arbitration provision stated an agreement between Kyre and Experian to "arbitrate all disputes and claims between [them]," subject to the exemption for any FCRA claim. (Id.) Based on this undisputed evidence, there is no genuine dispute of material fact that the parties entered into the 2017 Terms of Use Agreement which

17

contained an agreement to arbitrate disputes between them. Berkeley, 944 F.3d at 234; 9 U.S.C. §4.

**B.   Whether the 2017 Terms of Use Agreement Arbitration Provision Was Modified**

Experian argues, however, that the arbitration provision of the 2017 Terms of Use Agreement was modified by the arbitration provision in the 2023 Terms of Use Agreement, which eliminated the exemption for FCRA claims. Experian contends that Kyre assented to these updates through his continued use of CreditWorks, Experian's credit monitoring services. (Doc. 18 at 11.) Kyre responds that he never agreed to any updated version of the Terms of Use Agreement and is only bound, if at all, by the arbitration provision in the 2017 Terms of Use Agreement. (Doc. 16 at 2.) Kyre also argues that even if the 2023 Terms of Use Agreement applies, he may reject updates to its arbitration provision by exercising his right under paragraph (g) of the 2017 Terms of Use Agreement, which provides that "[n]otwithstanding any provision in this [2017 Terms of Use] Agreement to the contrary," he may "reject" "any change" to the 2017 agreement's arbitration provision "and require [Experian] to adhere to the language in [the] provision as written at the time of [his] enrollment" in CreditWorks. (Doc. 15-3 at 9.) Kyre maintains he exercised that right by filing this action. (Doc. 16 at 22–23.) Experian replies, alternatively, that any question whether Kyre's claims

18

fall within a contractual FCRA exception is for the arbitrator to decide. (Doc. 18 at 11.)

After the parties submitted their original briefs, the Fourth Circuit decided Modern Perfection, LLC v. Bank of America, N.A., 126 F.4th 235 (4th Cir. 2025), which relied on the Supreme Court's recent decision in Coinbase, Inc. v. Suski, 602 U.S. 143 (2024). These cases addressed whether questions about the arbitrability of disputes where the parties have conflicting agreements containing delegation clauses should be answered by the court or by the arbitrator. In Coinbase, the court held that where the "parties have agreed to two contracts – one sending arbitrability disputes to arbitration, and the other . . . sending arbitrability disputes to the courts – a court must decide which contract governs." 602 U.S. at 152. In Modern Perfection, the Fourth Circuit noted that Coinbase set out four different possible kinds of disputes in a case involving an arbitration clause: (1) a "first-order" dispute over the merits; (2) a "second-order" dispute over whether the parties agreed to arbitrate the merits; (3) a "third-order" dispute over who should have the primary power to decide the second matter; and (4) what the court described as a "fourth-order disagreement," that is, where the parties "have multiple agreements that conflict as to the third-order question of who decides arbitrability." Mod. Perfection, 126 F.4th at 239 (citation omitted). The court declined to "consider any fourth-order issues" because the party

19

opposing arbitration did not argue that a later contract between the parties "superseded or narrowed" the arbitration provision in their original contract. Id. at 240 (citation and internal quotation marks omitted). Because the parties disagreed about whether the 2017 Terms of Use Agreement or 2023 Terms of Use Agreement should govern any potential arbitration of this dispute and the parties were unfamiliar with Modern Perfection and Coinbase, the court directed them to address their application to this dispute, which they have done.

Experian now argues that these cases are inapplicable because they involved conflicting provisions as to who decides arbitrability – which Experian contends is not at issue here. (Doc. 41 at 5.) Rather, Experian contends (in a position that walks back its initial argument) that, because Kyre does not challenge the delegation provision in either the 2017 or 2023 version of the agreement, "the choice between the versions of the Terms of Use implicates only scope and enforceability," which has been delegated to the arbitrator. (Id. at 3 (capitalization omitted).) Kyre argues that it is for the court to decide which arbitration provision controls and that Experian cannot demonstrate that it provided Kyre reasonable notice of the alleged modifications in the 2023 Terms of Use Agreement. (Doc. 42 at 2, 5.) Thus, he argues, if any arbitration provision applies, it is the provision in the 2017 Terms of Use Agreement. (Id. at 9-10.)

20

Experian, as the moving party, must demonstrate that the parties formed the operative arbitration agreement it contends applies – here, the 2023 Terms of Use Agreement. This is a formation question for the court and not a question of scope (which is for the arbitrator), as Experian contends. <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 299-300 (2010) ("[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both matters, 'the court' must resolve the disagreement.") (citations omitted); <u>accord</u> <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 403-04 (1967) (stating that a dispute over the formation of the parties' arbitration provision (rather than its scope) is for the court to decide); <u>Meadows v. Cebridge Acquisition, LLC</u>, 132 F.4th 716, 727 (4th Cir. 2025) (finding, under West Virginia law, that subsequent arbitration agreement superseded prior arbitration agreement).

Here, Kyre challenges the existence of any arbitration agreement and contends that he never knowingly agreed to modify the arbitration provision in the 2017 Terms of Use Agreement. (Docs. 17 at 1-2; 42 at 7.) "[W]here a challenge applies 'equally' to the whole contract and to an arbitration or delegation

21

provision, a court must address that challenge." Coinbase, 602 U.S. at 151; cf. Rent-A-Center, 561 U.S. at 70-72 (finding that a plaintiff's challenge to the contract generally and not the arbitration agreement within it was for the arbitrator to resolve under the arbitration provision's delegation clause). Arbitration agreements are "simply contracts," and where "a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that [arbitration] agreement." Coinbase, 602 U.S. at 151 (citation and internal quotation marks omitted). Thus, where the parties present two conflicting arbitration agreements, as here, a court must decide which governs. Id. at 152. "To hold otherwise," as Experian argues here, "would be to impermissibly 'elevate [a delegation provision] over other forms of contract.'" Id. (quoting Prima Paint, 388 U.S. at 404 n.12). In making this decision, of course, the court applies traditional contract principles. Id. at 149; Mod. Perfection, 126 F.4th at 239; accord Williams, 2024 WL 3876171, at *15-18; see also Picha v. Gemini Tr. Co., No. 22 Civ. 10922, 2024 WL 967182, at *7-13 (S.D.N.Y. Mar. 5, 2024) (examining whether an arbitration agreement had been validly modified pursuant to New York Law despite competing versions which both contained delegation clauses).

Under North Carolina law, "[t]he provisions of a written contract may be modified or waived by a subsequent parol agreement,

22

or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived." Whitehurst v. FCX Fruit & Vegetable Serv., 224 N.C. 628, 636 (N.C. 1944) (citations omitted); Yamaha Int'l Corp. v. Parks, 325 S.E.2d 55, 58 (N.C. Ct. App. 1985) (noting that the "modification of a contract is as much a matter of contract as the original agreement"); Electro Lift v. Equip. Co., 166 S.E.2d 454, 456 (N.C. Ct. App. 1969) (noting that "[p]arties to a contract may, by mutual consent, agree to change its terms," and that "a written contract may ordinarily be modified by a subsequent parol agreement and such subsequent agreement may be either express or implied by conduct of the parties"); accord Williams, 2024 WL 3876171, at *15 (noting that the question of whether a similar modification attempt was valid is "effectively a contract-formation issue" and a "matter[] for judicial resolution" (citation and internal quotation marks omitted)). The court's "primary purpose is to ascertain the intention of the parties at the moment of [the contract's] execution." Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973). In doing so, the court gives ordinary meaning to the plain language of the contract. See DeLoach v. Lorillard Tobacco Co., 391 F.3d 551, 558 (4th Cir. 2004) (citations omitted).

The most recent pronouncement of North Carolina law on contract modification is Canteen v. Charlotte Metro Credit Union, 900 S.E.2d 890 (N.C. 2024). There, the North Carolina Supreme

Court enforced a subsequent change of terms to the parties'
agreement for online use of a financial account where the initial
agreement provided that the new terms would become effective upon
the consumer's continued use of the account after notice of the
modifications was provided.  Id. at 892-94.  The court held that
any modification made pursuant to a change-or-terms provision must
comply with the duty of good faith and fair dealing, which requires
that the change "reasonably relate to subjects discussed and
reasonably anticipated in the original agreement."  Id. at 896.

On this record, Experian has not demonstrated that holding
Kyre to the 2023 Terms of Use Agreement arbitration provision would
comply with North Carolina law.  The 2017 agreement provided that
Kyre was deemed to have accepted the then-current agreement each
time he "order[ed], access[ed] or use[d]" any of Experian's
"Services or Websites."  (Doc. 15-3 at 4.)  Experian's support for
its contention that Kyre is bound by the 2023 Terms of Use
Agreement is Smith's statement that Kyre "continuously remained
enrolled and used the service, including after the version of the
Terms of Use in effect at the time he filed this lawsuit came into
effect" (Doc. 15 ¶ 5), and Kyre's "acknowledgment that he has used
the service since 2017."  (Doc. 40 at 16-17.)  To be sure, Experian
has not argued, nor has it demonstrated, that Kyre's continued
enrollment in or use of the CreditWorks service would have required
him to have independently agreed to the 2023 Terms of Use Agreement

24

in the fashion required during his initial enrollment in 2017. Nor has it provided any factual information to indicate that it provided notice to Kyre that the 2017 Terms of Use Agreement had been changed, or whether (and how) Kyre would have had access to the 2023 Terms of Use Agreement prior to using the service. While Canteen enforced a unilateral change-of-terms provision, it did so in the context of an initial agreement that required notice to the consumer of the proposed changes. 900 S.E.2d at 898.[4] Accord Meadows, 132 F.4th at 725-27 (enforcing arbitration provision under West Virginia law providing that continued use following notice of modifications will be deemed acceptance); Marshall, 112 F.4th at 219-221 (holding that a proposed arbitration agreement lacked "reasonable notice" required by South Carolina law); Dhruva v. CuriosityStream, Inc., 131 F.4th 146, 151-54 (4th Cir. 2025) (concluding that a web interface provided consumers sufficient notice of the terms of a proposed agreement which included an arbitration agreement); see also Willams, 2024 WL 3876171, at *18-22 (rejecting Experian's attempt to modify the applicable Terms of Use Agreement under Arizona law, which required reasonable notice of both the modification and the fact that continued use without

---

[4] The court's statement that a contract containing a mutually agreed upon "change-of-terms" provision "must be enforced as it is written," 900 S.E.2d 890 at 894 (quoting Home Owners' Loan Corp. v. Ford, 193 S.E. 279, 280 (N.C. 1937)), must be read in light of the court's express acknowledgement that the provision required notice of the proposed modifications.

25

rejection will result in assent). Thus, even assuming that the modifications to the arbitration provision of Experian's 2023 Terms of Use Agreement reasonably relate to the subjects discussed in the 2017 version of the arbitration agreement, Experian has provided no authority that North Carolina courts would enforce them absent <u>some</u> form of notice to the consumer.[5]

Because Experian has failed to provide factual support sufficient to make out a prima facie case that Kyre should be bound by the 2023 Terms of Use Agreement's arbitration provision under North Carolina law, Experian's motion to compel arbitration will be granted, but in accordance with the arbitration provisions of the 2017 Terms of Use Agreement.[6]

## III. CONCLUSION

For the reasons stated,

---

[5] Having reached this conclusion, the court need not resolve how Kyre would have accessed a copy of his 2024 Experian credit report to learn whether it erroneously reported his death without waiving his right in paragraph (g) of the 2017 Terms of Use Agreement to object to revisions to the arbitration provision. Here, Kyre allegedly learned the Experian report erroneously reported his death after he ordered a copy of his consumer file from Experian in January 2024, roughly one month after Experian says the December 11, 2023 Terms of Use Agreement came into effect. (Doc. 1 ¶ 80.)

[6] It is not the court's role to determine whether Kyre's claims fall within the scope of the applicable arbitration provision. <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 586 U.S. 63, 68 (2019) (where a contract delegates to an arbitrator the question of whether a particular claim is subject to arbitration, "a court possesses no power to decide the arbitrability issue," even if the argument that a particular claim is subject to arbitration is frivolous or "wholly groundless").

IT IS THEREFORE ORDERED that Experian's motion to compel arbitration (Doc. 13) will be GRANTED to the extent that this matter shall be referred to arbitration in accordance with this memorandum opinion and order, and the case shall be STAYED in the interim. The parties are directed to provide a report to the court every 90 days as to the status of the arbitration.

/s/   Thomas D. Schroeder
United States District Judge

May 30, 2025